DESURE v. NEW YORK CENT. & H. R. R. CO. et al.

(Supreme Court, Appellate Division, First Department.   May 6, 1904.)

1. NEGLIGENCE—DUTY OF RAILWAY COMPANY.

Where a railway company had built a bridge with a draw, and under a contract with the city had turned over the control and care of a foot-path thereon to the city, and the company gave the ordinary signals, and opened the draw in a proper manner, it was not guilty of negligence resulting in the death of a boy who walked off the draw into the water and was drowned.

2. CONTRIBUTORY NEGLIGENCE.

A bright boy, 15 years old, partially blind, who, a short time after being warned against going on a bridge alone, went on the bridge, and, when the draw was open, walked off into the water, was guilty of contributory negligence.

O'Brien and Hatch, JJ., dissenting in part.

Appeal from Trial Term, New York County.

Action by Jacob Desure, administrator of Hymon Desure, deceased, against the New York Central & Hudson River Railroad Company and the city of New York. From a judgment in favor of plaintiff, and from an order denying a new trial, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Robert M. Kutschbock, for appellant New York Cent. & H. R. R. Co. Theodore Connoly, for appellant city of New York. Darlington, Sherman & Jenkins, for respondent.

INGRAHAM, J.   The action was brought to recover for the death of the plaintiff's intestate on the 5th day of July, 1901.   It appeared that the bridge was built over the Hudson river at 155th street by the West Side & Yonkers Railway Company, in pursuance of a consent of the department of public parks of the city of New York, granted by a resolution of the park department passed on the 7th day of January, 1880.   After the passage of the resolution, an agreement was made between the mayor of the city of New York and the railway company, which provided that, in consideration of the consent, the railway company covenanted and agreed to construct the said bridge as a railroad bridge, with ways for foot passengers; that, when completed, the railway company agreed to keep and maintain the said bridge and its footways in complete and perfect order, and the said footway, except when the draw was necessarily opened, should be open for free use for all persons desiring to pass and repass the same on foot; that the use of said footway by the public should be under such rules and regulations, requirements and ordinances, prescribed or which might thereafter be prescribed by the department of parks; that the said department might appoint an inspector or detail any officer of said department to the duties of such inspector, who should do and perform such duties in relation to the subject-matter of the agreement as might be assigned to him by said department.   By an additional agreement made between the New York & Northern Railway Company, which was the successor of the West Side & Yonkers Railroad Com-

pany, and the mayor, aldermen, and commonalty of the city of New York, there was granted to the city of New York a temporary right of way, to be used by all and any persons on foot along and over a certain road or way to be laid out over and through the premises of the railroad company, which obtained access to the footway on the said bridge; and by it the city of New York was authorized to take such other measures in regard to the construction, maintenance, and repair of the said road or way as should be necessary to render the same convenient and safe for the passage of pedestrians; and this agreement further provided that "the said parties of the second part [the mayor, etc., of New York] hereby assumed all responsibility and risk of damage and personal injury to individuals while on said footways or approaches, and agree to light the same at its expense, and police the same, and maintain the necessary gates and gatemen, so that the opening and closing of the draw may be without unnecessary risk to foot passengers, and will indemnify and save harmless the party of the first part from all liability of every kind and nature to individuals using said footways and approaches." In pursuance of these agreements the bridge was built with a footpath for passengers. There was a gate erected upon the footpath upon the main bridge just before coming to the draw, so that persons walking upon the footpath would be prevented from passing on to the draw of the bridge, and the department of parks maintained a watchman or bridge tender, whose duty it was to open and close the gates and keep the footway in good condition. It also appeared that upon receiving a signal that the bridge was about to be opened the bridge tender was instructed to immediately clear the draw of all persons and to close the gates. On the 5th of July, 1901, one Crawford was bridge tender on duty on this bridge at about 2 o'clock in the afternoon. At that time the draw of the bridge was opened, and, as it was slowly moving, the end of the draw having been separated from the bridge, a boy was seen upon the draw walking off into the river. It was broad daylight. There was nothing to obstruct the sight, and the only evidence in relation to the accident was that the boy walked off the end of the draw after it had swung away from the bridge into the river. A witness who saw the boy fall testified that he was crossing the bridge from the west to the easterly side of the river, and as he got to the bridge tender's house upon the bridge the watchman said to him, "You are too late;" that he then looked up, and saw the draw slowly opening, saw that the gate was open, and then a few seconds after saw this boy walk off the end of the draw. The boy was drowned, and his body was subsequently found in the water. It appeared that the boy was about 15 years of age; that he was partly blind, and had been a peddler; that on the same day the bridge tender who was on duty before Crawford saw this boy start to cross the bridge alone; that the bridge tender asked him where he was going, and he said that he wanted to go to the 155th Street Bridge (meaning the viaduct at 155th street), to which the bridge tender said that he was going that way, and would take the boy down; that the bridge tender led the boy by the arm down and cautioned him not to go on the bridge again, telling him that it was no fit place for a boy who was blind, and not to go on there unless he had somebody to lead

him, that some accident might happen to him on the stairs, or something to that effect, and left him at the elevated railroad station at 155th street and 8th avenue, or the New York side. It was upon this evidence that the case was submitted to the jury, who found a verdict against both defendants, and from that verdict the defendants separately appeal.

It is apparent that the evidence did not justify a finding of negligence against the railroad company. It was not in control of this footpath, had nothing to do with it, was not responsible for its care, and there was not the slightest evidence that there was any negligence in opening the draw, that the ordinary signals were not given, or of anything to charge the railroad company with negligence. Under the agreement between the department of parks and the railroad company, it was the department of parks that undertook to safeguard this bridge and regulate the traffic there, and to provide the necessary bridge tenders to make passage safe; and there was no evidence to show that any duty assumed by the railroad company, or that was imposed upon it, was in any way neglected, or that the accident was caused in any way by any act of the railroad company or its employés.

A different question is presented as to the liability of the city. Under its agreement with the railroad company the city assumed to maintain this footpath for the public convenience, and to provide a bridge tender, whose duty it was, upon the signal being given that the draw was to be opened, to close the gates, and to see that all people were off the draw. For some reason, not explained, this boy got upon the draw before it was opened, and walked off into the river. As the bridge tender and the boy are both dead, there could be no explanation given. It was proved that the bridge tender was at the time of the accident at his shanty, which was on the footway, not far from the gate leading from the west to the draw. The boy had, on this same day, about one hour before the accident, been cautioned about attempting to cross this bridge unattended. The danger of such an attempt was explained to him, and he is next seen some time after this warning upon the draw, as he was falling off. How long he had been upon the draw, when and under what circumstances he went there, and what he was doing there, were not disclosed. The evidence furnished by his parents and sisters is that he was not entirely blind, but could see for some distance; and, assuming that there was evidence to justify a finding that this bridge tender neglected the duty of seeing that all persons were off the draw before it was opened, the question is whether or not, under these circumstances, there was evidence to justify a finding that the plaintiff's intestate was free from contributory negligence.

I am inclined to think that the evidence does not justify such a finding. The boy was not absolutely blind, and was in the habit of going about the streets alone. He had been but a short time before upon this bridge, had been taken off by the bridge tender, and cautioned not to go again on the bridge unattended. In the face of this caution, he returned to the bridge, and in some way got upon the draw, and then walked off the draw into the river. While it is quite clear that a person thus afflicted is not bound to exercise the same care that a person

whose sight is not impaired is bound to exercise, at the same time the decedent's infirmity did not relieve him from the exercise of the care of a prudent person, considering his condition, in doing what he did when he was injured. He was said to be, but for his infirmity, a bright boy, who was in the habit of going about the city and finding his way without difficulty. He had been cautioned not to go upon this bridge alone. He was told that he was liable to just the accident that happened to him, and in the face of that warning he went upon the draw, and then walked off the draw into the river. In the absence of testimony explaining the circumstances under which he went upon the bridge, which would tend to relieve him from a violation of the warning which he had a short time before received, there is nothing to justify a finding that he exercised any care. Here was a perfectly apparent situation. It was broad daylight, and any one walking upon this draw at the time of the accident would necessarily have knowledge of the fact that the draw was in motion, and that to walk off the end of the draw would result in a fall into the river. There could certainly be no recovery in this case if the boy had had his sight. The fact that he was partially blind would possibly, in the absence of proof that he had been warned not to go upon the bridge, have made the question of his contributory negligence a question for the jury. But if he was so blind that he was unable to see whether he was walking off the end of the draw, it was negligence for him to attempt to walk across this bridge unattended, after the warning that he had received a short time before that it was unsafe for him to do so. In other words, so far as crossing this bridge was made dangerous by his not being able to see, it was negligence for him, in the face of a warning of the danger, to have crossed the bridge without such attendance as would enable him to avoid the danger of which he had been warned. My conclusion is, therefore, that this verdict, which must be based upon a finding that the deceased was free from contributory negligence, is not supported by the evidence, and for that reason there must be a new trial.

The judgment against both the defendants and the order appealed from must, therefore, be reversed, and a new trial ordered, with costs to the defendants to abide the event.

VAN BRUNT, P. J., concurs. McLAUGHLIN, J., concurs in result. O'BRIEN and HATCH, JJ., concur as to the railroad company and dissent as to the city.